**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Water & Sand International Capital,       )
Ltd.                                                        )
                                                              )
v.                                                          )          C.A. No. 1:08-CV-88-RCL
                                                              )
Capacitive Deionization Technology Systems, )
Inc.                                                        )
_____)

**OPPOSITION TO MOTION TO DISMISS**

Plaintiff Water & Sand International Capital, Ltd. (W&S) hereby opposes

the motion of Capacitive Deionization Technology Systems, Inc. (CDT) to

dismiss, transfer or stay the complaint.

**I.       INTRODUCTION**

CDT borrowed $3.2 million from the plaintiff, and did not repay it.  When it

executed five notes for the loans, and later when it executed two additional

consolidated notes, CDT irrevocably agreed in writing that any effort to collect on

the promissory notes would be brought in this jurisdiction.  W&S brought this suit

in accordance with the agreement to litigate here.  CDT now prefers to litigate in

Texas.

CDT is not the first defendant to repent of a forum selection clause and

look for a way to evade it.  Such efforts are routinely rejected by courts, and this

effort should be too.

**II.      FACTS**

The facts at issue are simple:

1.       CDT borrowed $3.2 million.

2.      CDT signed a series of seven promissory notes in which it irrevocably agreed that any suit to enforce the notes would be brought solely in this jurisdiction.

3.      CDT failed to repay either the $3.2 million it borrowed or the interest on that sum.

4.      Notwithstanding its repeated agreements that any suit to collect the loaned amount would be litigated here, CDT seeks to block litigation in this jurisdiction because it prefers to litigate in Texas.

CDT makes many conclusory allegations of wrongdoing by the plaintiff and its principal, but those are not facts.  No evidence is presented.  As we will address in more detail herein, the various allegations of wrongdoing lack any factual basis.  Moreover, as we will show herein, the conclusory allegations would not affect the enforceability of the forum selection clause even if they did have some basis.

III.    The Forum Selection Clause Is Enforceable

CDT does not dispute that the seven notes it executed all contain a forum selection clause, requiring that any suit to collect the unpaid debt which it owes to the plaintiff must be brought in this jurisdiction.  It concedes that the "correct approach" generally is to enforce forum selection clauses.  That is undoubtedly the law.  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972).

CDT argues, however, that in this case, the forum selection clause is not enforceable.  It argues first that there is no personal jurisdiction over it under the District of Columbia long-arm statute.  But lack of personal jurisdiction is a

defense that can be waived, and a forum selection clause is recognized as waiving personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985). As stated in the forum selection clause, "CDT irrevocably consents to personal jurisdiction in the District of Columbia for purposes of any collection action...." Exhibit 1 and 2.[1]

CDT then argues that exercising jurisdiction over it would violate due process because it could not reasonably anticipate being haled into court here. That assertion is contradicted by the forum selection clause. After all, CDT executed seven notes stating that CDT "further consents to having any collection action to be heard solely before the courts of the District of Columbia ...." It then invited suit by not repaying the $3.2 million. How could CDT not have anticipated being haled into court here?

In any event, it is well-settled that jurisdiction by consent satisfies constitutional principles of due process. *National Equip. Rental, Ltd.* v. *Szukhent,* 375 U.S. 311 (1964).

Given that forum selection clauses generally are enforced, CDT is forced to rely on the contention that the clause in this case should not be enforced because it is "rife with fraud, overreaching and fiduciary breach." While the nature of this allegedly nefarious conduct is a bit obscure, the allegation apparently is based on the assertions that Chester Nosal, the principal of W&S,

---

[1]     There were seven notes, all of which are attached to the affidavit of John Davies, which CDT submitted in support of its motion. The first five notes were consolidated into the sixth, and an additional $200,000 was loaned, resulting in the seventh. The present suit seeks to enforce the last two notes, which are attached hereto as Exhibits 1 and 2. The initial five notes also included forum selection clauses.

was CDT's general counsel[2] and on its Advisory Board, and consequently, his lending of money to CDT was somehow a breach of his ethical and legal duties to CDT and a breach of his fiduciary duty. CDT further contends that the forum selection language was inserted without discussion with CDT's board members. These allegations (even if they were true) fall far short of what is necessary to invalidate a forum selection clause.

First, the law is clear that it is not enough to challenge the contract; the defendant must show that the clause itself was the result of fraud or other misconduct. As this Court noted in *L&L Construction Associates, Inc. v. Slattery Skanska, Inc.*, 2006 WL 1102814, *4 (D.D.C. 2006), "in deciding whether the forum selection clause is enforceable, the Court treats the clause as a contract unto itself. ... The Court only examines the forum selection clause, making no findings concerning the remaining portions of the contract...." See also *2215 Fifth Street Associates, LP v. U-Haul International, Inc.*, 148 F.Supp.2d 50, 55 (D.D.C. 2001) ("fraud and overreaching must be specific to a forum selection in

---

[2]    CDT makes several assertions of "fact" that do not affect the outcome of the motion, but we will address them lest our silence be considered an acknowledgement of accuracy. Although the motion asserts Mr. Nosal was CDT's general counsel, there is no evidence of such. He was not. Exhibit 3 ¶4. See also CDT's Form 10-KSB/A for the year ended December 31, 2005 (Ex. 4 at 19), which identifies Mr. Nosal as an advisor, not as general counsel. Mr. Davies in his affidavit asserts that there was an undisclosed conflict of interest arising from, apparently, a failure to disclose the relationship between W&S and Mr. Nosal. Davies Affidavit ¶15. However, Mr. Davies executed a Form 10-KSB/A on April 14, 2006 (6 months before the notes at issue) explicitly recognizing the connection between W&S and Mr. Nosal. Ex. 4 at 27. The assertion that CDT lacked independent legal advice is contradicted by the same Form 10-KSB/A, which identifies William Lee as an attorney and CPA who advises CDT on legal and accounting matters. The assertion that Mr. Nosal drafted the promissory notes is false. Ex. 3 ¶6.

order to invalidate it"); *Marra v. Papandreou*, 59 F.Supp.2d 65, 70 n.3 (D.D.C.

1999) ("A claim of fraud in the inducement of a contract is insufficient to

invalidate a forum selection or choice-of-law clause found in that contract.

Rather, it is the inclusion of those specific clauses plaintiffs seek to avoid that

must have been induced by fraud"), *aff'd*, 216 F.3d 1119 (D.C. Cir. 2000).  CDT

makes no effort to link the allegations of impropriety to the forum selection

clause.  It alleges impropriety in connection with "the loans and accompanying

notes," not with the clause itself.  Memorandum in Support at 3.  Thus, the effort

to disregard the forum selection clause would fail even were there some

substance to the allegations.

And there is no substance to the allegations.  CDT bears the burden of

proof on this issue, and it is a heavy burden.  *Carnival Cruise Lines v. Shute*, 499

U.S. 585, 592 (1991) ("the party claiming [unfairness] should bear a heavy

burden of proof").  As this Court recognizes, mere conclusory allegations do not

meet that heavy burden.  *L&L Construction*, 2006 WL at *4 ("Plaintiff only makes

conclusory allegations that the clause was the result of fraud and

misrepresentations, but these allegations are insufficient to overcome the strong

presumption in favor of enforcing forum-selection clauses").

CDT asserts that there was no discussion of the forum selection clause

with the board of directors, but the evidence of that is flimsy.  CDT relies only on

an affidavit of John Davies, who first became a member of the board and CEO of

CDT in mid October 2006.  Affidavit of John Davies ¶2.  Five of the notes with the

forum selection clause had already been executed.  Thus, he has no knowledge

whether the forum selection was discussed in connection with those notes.  Of course, if it was discussed previously, there is no need to discuss it again.  As attested by Mr. Nosal, the clause was brought to management's attention.  Ex. 3 ¶6.

Nor is there precedent that says a forum selection clause must be discussed to be enforceable.  In *Carnival Cruise Lines*, for example, the Supreme Court upheld a forum selection clause that was buried in the 8th of 25 paragraphs on the back of a ticket that was not provided to the consumer until after payment was made.  499 U.S. at 597 (Stevens, J., in dissent).  See also *2215 Fifth Street*, 148 F.Supp.2d at 56 ("the presumption in favor of enforcing a forum selection clause applies even if the clause was not the product of negotiation").

The suggestion that the directors of CDT were ignorant of the forum selection clause or could not appreciate its significance is ludicrous.  The clause was on the face of a short agreement in plain language.  Each of the seven notes was signed by two of Dallas Talley, Phil Marshall and Joe Jones.  These are experienced, sophisticated businessmen.  Here is how they are described in CDT's Form 10-KSB filed with the Securities and Exchange Commission:

> **Dallas Talley**, Chairman and CEO, has over twenty-five years of high tech senior executive experience. He has been CEO of New York Stock Exchange and NASDAQ companies including Qantel Business Computers, Televideo Systems and Zentec Corp. He has also been founder and director of several emerging companies. Mr. Talley was Managing Partner of an international technology development group specializing in technology transfers in Asia Pacific, Europe and selected developing nations. He served on the Board of Directors of the American Electronics Association (AEA) from 1984 to 1989 and served as Chairman of AEA's Silicon Valley Chapter. Since joining the Board of Directors in 1998, Mr. Talley has been responsible for maintaining and expanding the company's

relationship with Lawrence Livermore National Laboratories and for implementing the company's private placements and strategic alliances.

**Phil Marshall,** Chief Financial Officer, has over thirty years experience in financial management and audit services. He has been a Principal or Partner for over twenty years with KMG Main Hurdman, KPMG Peat Marwick, Jackson & Rhodes, and Whitley Penn. His public accounting experience includes multinational companies with extensive SEC reporting in a variety of operating companies including environmental, manufacturing and service companies. Mr. Marshall joined the Company in the third quarter of 2003.

**Joe Jones**, Vice President Business Development, has over 22 years experience in business development, business expansion and strategic alliance development with multi-billion dollar organizations. He spent over 16 years with Niagara Mohawk Power Corporation in strategic and business planning, business development and alliance/partnership development. He was President of a multi-million-dollar start-up subsidiary for UPM-Kymmene, a 10 billion-dollar forestry products company headquartered in Helsinki, Finland.

Exhibit 5 at 12.

These are sophisticated business people who do not need to be told that signing a note that says "CDT irrevocably consents to personal jurisdiction in the District of Columbia for purposes of any collection action, which may be necessary to insure payment of this note; and it further consents to having any collection action to be heard solely before the courts of the District of Columbia ..." means that if CDT does not pay its debt, it will be sued in the District of Columbia.

Forum selection clauses have been upheld even where a much less sophisticated contracting party has less awareness than these sophisticated business people clearly did. As noted above, in *Carnival Cruise Lines* the party

was a consumer who was not even given the clause until after she paid for her ticket, and the clause was buried in small print on the reverse.  In *Forrest v. Verizon Communications, Inc.*, 805 A.2d 1007 (D.C. 2002), the court found that a forum selection clause in a form consumer contract on the last of 13 pages which consumers had to read by scrolling through a box on a website was reasonably communicated.

**IV.  Rule 13 Does Not Require Dismissal or Transfer**

CDT next argues that this case must be dismissed or transferred because related suits are already pending in Texas.  CDT asserts that the present case is a compulsory counterclaim.  It does not cite F.R.Civ.P. 13, but that is clearly the foundation of its argument.  The reason CDT avoids citing F.R.Civ.P. 13 is apparent.  Many defendants have sought to evade a forum selection clause by racing to the courthouse in a more congenial jurisdiction, and then asserting that Rule 13 requires the plaintiff to raise its action as a counterclaim.  These efforts, while displaying the full range of clever tactics and artful pleading, always fail. See, e.g., 3 Moore's Federal Practice § 13.16[4], with the revealing title "Counterclaim Need Not Be Pleaded When It Is Subject of Forum Selection Clause Requiring Parties to Litigate in Another Forum."

The leading case on this subject is *Publicis Communication v. True North Communications Inc.*, 132 F.3d 363 (7th Cir. 1997).  Two companies entered into an agreement specifying that any claim arising out of a certain portion of the agreement would be brought in the State of Delaware.  When relations went sour, True North sued Publicis in Delaware state court pursuant to a mandatory

8

forum selection clause.  Publicis then sued True North in federal district court in

Chicago on an issue outside of the forum selection clause.  True North filed a

compulsory counterclaim in Chicago, but the counterclaim was within the scope

of the forum selection clause that had mandated Delaware as the forum.  The 7th

Circuit held that the federal district court should not have considered the

counterclaim because it should have been filed in Delaware pursuant to the

forum selection clause. 132 F.3d at 366.

The *Publicis* court ruled that the defense that a claim is a compulsory

counterclaim is an affirmative defense that can be waived.  A forum selection

clause waives it.  It likened a forum selection clause to an arbitration agreement,

which it said is a particular kind of forum selection clause.  The forum selection

clause has the effect of a promise by the parties not to invoke the defense of

preclusion when a related suit is filed in another jurisdiction.

Other courts that have recently rejected efforts to dodge a forum selection

clause by reference to F.R.Civ.P. 13 include *United Consumers Club, Inc. v.

Prime Time Marketing Management, Inc.*, 2008 WL 150623 (N.D.Ind. 2008);

*Sorenson v. Riffo*, 2007 WL 1343694 (D. Utah 2007); *FASTI USA v. FASTI

Farrag & Stipsits GmbH*, 2003 WL 1581472 (N.D. Ill. 2003); *Truserv Corp. v.

Flegles, Inc.*, 2003 WL 22839812 (N.D.Ill. 2003); *Kenray v. Judson Atkinson

Candies, Inc.*, 2002 WL 2012439 (S.D.Ind. 2002); *Sokkia Credit Corporation v.

Bush*, 147 F. Supp. 2d 1101 (D.Kan. 2001); *Innovative Tech Systems, Inc. v.

Micro Computer Co.*, 1998 WL 398245 (E.D.Pa. 1998).

The precedence that a forum selection clause takes over the normal requirements of F.R.Civ.P. 13 is apparent from the fact that courts have held that not only is a plaintiff not obligated to bring its claim as a compulsory counterclaim in a forum other than the one on the contract, but the plaintiff is **prohibited** from doing so. See, for example, *Sokkia* and *Kenray*. Thus, W&S would be prohibited from bringing its claim as a counterclaim in the Texas litigation, notwithstanding the normal dictates of F.R.Civ.P. 13.

The cases cited by CDT are to no avail. They recite the normal rule that all claims should be litigated in the same action, and a party must bring its related claims as a compulsory counterclaim rather than as a new suit in a different jurisdiction. These cases have no applicability where there is a mandatory forum selection clause, as there is here.

### V. The Case Should Not be Transferred

The normal *forum non conveniens* rules do not apply where there is a mandatory forum selection clause. *Overseas Partners, Inc. v. Progen Musavirlik Ve Yoneth Hizmetleri, Ltd.*, 15 F.Supp.2d 47, 54 (D.D.C. 1998) ("This analysis, however, changes when the parties have agreed to a forum-selection clause"); *2215 Fifth Street*, 148 F.Supp.2d at 58 ("this Court has held that when the parties have agreed to a forum selection clause, the traditional analysis is altered....").

CDT claims inconvenience if it has to litigate here. But as this Court noted in *Kotan v. Pizza Outlet, Inc.,* 400 F.Supp.2d 44, 50 (D.D.C. 2005), one party will always be inconvenienced by the choice of a forum: "This is inherent in a forum

selection clause.  Unless all parties reside in the selected jurisdiction, any litigation will be more expensive for some than for others."

The short answer to CDT's claims of inconvenience was noted by this Court in *Kotan*: CDT "should have foreseen these obstacles when signing the agreement which included the forum selection clause."  400 F.Supp.2d at 51.  In *Overseas Partners*, where the plaintiff was faced with a contract designating Turkey as the forum, the court noted "these obstacles – though undeniably significant – were or should have been readily apparent to plaintiff, a sophisticated commercial entity, at the time it agreed to the choice-of-law and forum-selection clause."  15 F.Supp.2d at 55.  See also *Truserv Corp. v. Flegles, Inc.*, 2003 WL 22839812, *3 (N.D.Ill. 2003) ("It would be unfair to allow Flegles to enjoy the benefits of the contract and then allow Flegles to circumvent the provisions, such as the forum selection clauses, which were inserted for Truserv's benefit").

Mere inconvenience or expense is not sufficient to outweigh a forum selection clause.  The party seeking to avoid the agreement must demonstrate – not merely allege – that trial in the agreed forum will deprive it of its day in court.  *L&L Construction*, 2006 WL 1102814 at *5.  Previous cases show that this bar is high.

In *Carnival Cruise Lines*, a consumer in Washington State booked a cruise leaving from California, and was injured while at sea in the Pacific.  A forum selection clause in small print buried in lengthy verbiage on the back of a non-refundable ticket required litigation in Florida.  That was enforced, even though

there is no domestic forum in the Continental U.S. more distant to a plaintiff in Washington than Florida, and it was highly unlikely that any witnesses to an occurrence in the Pacific or relevant documents would have been in Florida.  The owner of a coffee shop in the District of Columbia was required to sue a supplier in Texas based on a forum selection clause in *Yazdani v. Access ATM*, __ A.2d __ (D.C. 2008).  That distant forum did not preclude a day in court, although only $7,000 was at issue.  In *Marra v. Papandreou*, New York plaintiffs had to sue in Greece.  Judge Urbina explained that "the *ability* to bring suit in a foreign forum does not necessarily equate with the *ease* of doing so."  59 F.Supp.2d at 72.  Thus, "the expense and inconvenience of litigating in a foreign forum does not render that forum inadequate."  59 F.Supp.2d at 72.  Only a showing that the inconvenience is "so serious as to foreclose a remedy, perhaps coupled with a showing of bad faith, overreaching or lack of notice, would be sufficient to defeat a contractual forum selection clause."  59 F.Supp.2d at 72.  The cost of bringing a few witnesses to this jurisdiction does not prevent CDT from presenting a defense to a multi-million dollar suit.

## VI.    The Case Should Not Be Stayed

As a fall-back, CDT asks that this case be stayed, thereby delaying even longer its obligation to repay the $3.2 million it borrowed.  There is no basis for delaying W&S's claim pending resolution of CDT's efforts to circumvent the forum selection clause.

As CDT notes, proceeding on two tracks is wasteful.  But that is a waste CDT has brought on itself by trying to wriggle out of its agreement to litigate here.

This issue was addressed in *Truserv Corp. v. Flegles, Inc.*, 2003 WL 22839812,

*4 (N.D.Ill. 2003):

> Although the issues in both cases could be resolved in one court, the reason that the cases have developed in separate venues is Flegles' disregard of the forum selection clause and its race to the courthouse.  We will not allow the concern of piecemeal litigation to override the principles of fairness and equity.  Were it otherwise, any party seeking to avoid the effect of a forum selection clause could simply file suit first in a venue of its choice and argue that the venue of its choice should hear all claims to avoid piecemeal litigation.

Here also, it would be unfair to delay W&S's suit for an unpaid debt of $3.2

million to accommodate CDT's ploy to circumvent the forum selection clause.

## VII. Conclusion

W&S respectfully urges that CDT's motion be denied.

Respectfully submitted,

<u>/s/ David U. Fierst</u>
Glenn A. Mitchell (#052233)
gamitchell@steinmitchell.com
David U. Fierst (#912899)
dfierst@steinmitchell.com
Stein, Mitchell & Mezines, LLP
1100 Connecticut Avenue
Suite 1100
Washington D.C. 20036
Tel:  202-737-7777
Fax: 202-296-8312

February 19, 2008

## CONSOLIDATED DEMAND NOTE

$3,000,000                                      November 1, 2006

FOR VALUE IN HAND RECEIVED, CAPACITIVE DEIONIZATION TECHNOLOGY
SYSTEMS, INC. (CDT) a corporation incorporated in Nevada, promises to pay on demand
Water & Sand International Capital, Inc. (W&S) with offices at Cupecoy Beach Club Suite 201,
Lowlands, St. Maarten, Netherlands Antilles, or its order, the principal sum of Three Million
USD, plus interest at the rate of one and one-half percent (11/2%) per month on or before April
30, 2006. Payment shall be made at the offices of RBTT Bank St. Maarten, NV, Front Street,
Emmaplein, Philipsburg, St. Maarten, Netherlands Antilles or as Payee, through its attorney
(Chester Nosal), may designate in writing from time to time.

At any time W&S or the holder of this note upon 65 days prior written notice to CDT may
convert any and all of this note payable and accrued interest to CDT Rule 144 common stock at a
price of twenty cents ($.20) USD per share. Interest shall accrue at the rate of three percent (3%)
per month until paid in full if the note is not paid in full on or before April 30, 2006. This note
may be paid in whole or in part at any time.

Moreover, CDT irrevocably consents to personal jurisdiction in the District of Columbia for
purposes of any collection action, which may be necessary to insure payment of this note; and it
further consents to having any collection action to be heard solely before the courts of the
District of Columbia under Nevada law. This note is a consolidation of all prior notes owed to
W&S at November 1, 2006.

MAKER:
Capacitive Deionization Technology Systems, Inc.


Dallas Talley, Chairman


ATTESTED TO:


Phil Marshall, Chief Financial Officer

Exhibit G                                      051
                                               Promissory Note

## CONSOLIDATED DEMAND NOTE

**$200,000**                                        **November 2, 2006**

**FOR VALUE IN HAND RECEIVED,** CAPACITIVE DEIONIZATION TECHNOLOGY SYSTEMS, INC. (CDT) a corporation incorporated in Nevada, promises to pay on demand Water & Sand International Capital, Inc. (W&S) with offices at Cupecoy Beach Club Suite 201, Lowlands, St. Maarten, Netherlands Antilles, or its order, the principal sum of Three Hundred Thousand USD, plus interest at the rate of one and one-half percent (11/2%) per month on or before June 30, 2007. Payment shall be made at the offices of RBTT Bank St. Maarten, NV, Front Street, Emmaplein, Philipsburg, St. Maarten, Netherlands Antilles or as Payee, through its attorney (Chester Nosal), may designate in writing from time to time.

Funds under this note will be released $50,000 on October 24, 2006 and monthly thereafter continuing until January 24, 2007.

At any time W&S or the holder of this note upon 65 days prior written notice to CDT may convert any and all of this note payable and accrued interest to CDT Rule 144 common stock at a price of twenty cents ($.20) USD per share. Interest shall accrue at the rate of three percent (3%) per month until paid in full if the note is not paid in full on or before June 30, 2007. This note may be paid in whole or in part at any time.

Moreover, CDT irrevocably consents to personal jurisdiction in the District of Columbia for purposes of any collection action, which may be necessary to insure payment of this note; and it further consents to having any collection action to be heard solely before the courts of the District of Columbia under Nevada law.

**MAKER:**
**Capacitive Deionization Technology Systems, Inc.**

**Dallas Talley, Chairman**

**ATTESTED TO:**

**Phil Marshall, Chief Financial Officer**



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Water & Sand International Capital, )
Ltd. )
                          )
v.                        )     C.A. No. 1:08-CV-88-RCL
                          )
Capacitive Deionization Technology Systems, )
Inc. )
                          )

## DECLARATION OF CHESTER NOSAL

I, Chester Nosal, do hereby declare as follows:

1.     I have personal knowledge of the matters stated herein.

2.     I am a shareholder of defendant Capacitive Deionization Technology Systems, Inc. I am also the President and sole shareholder of plaintiff Water & Sand International Capital, Ltd.

3.     I am a member of the Bar of the District of Columbia.

4.     I advised and consulted with CDT. The legal services I provided to CDT primarily involved the drafting of a project financing contract for the country of Jordan and the World Bank. I was never the General Counsel of CDT. CDT received legal advice from William Lee and Robert Axelrod, both of whom are members of the Texas Bar.

5.     W&S made substantial loans to CDT. At the time these loans were made, I fully disclosed to the management of CDT that I was affiliated with W&S.

6.     The loans were evidenced by at least seven promissory notes which were initially prepared by Joe Jones and subsequently by Phil Marshall. They were substantially in the same form as those issued in a series of notes



that CDT issued to numerous investors.     I insisted on a forum selection clause specifying that any suit to enforce the terms of the notes would be in the District of Columbia.  Management at CDT was aware of this provision, and agreed to it.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February _19_, 2008.

Chester Nosal

10KSB/A 1 cdts10ka05.htm

# U. S. SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## FORM 10-KSB/A

**(Mark One)**

[X]    **ANNUAL REPORT UNDER SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2005**

[  ]    **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM _____ TO _____.**

**Commission file number 0-28291**

**Capacitive Deionization Technology Systems, Inc.**
Operating under CDT Systems, Inc.
(Name of small business issuer in its charter)

| Nevada | 86-0867960 |
|---|---|
| (State or other jurisdiction of Incorporation or organization | (I.R.S. Employer Identification |

| 4251 Kellway Circle, Addison, TX 75001 | 75244-4410 |
|---|---|
| (Address of principal executive office) | (Zip Code) |

Issuer's telephone number (972) 934-1586

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which Registered |
|---|---|

Securities registered pursuant to Section 12(g) of the Act:
$.0001 par value common stock
(Title of class)

Check whether the issuer is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.    ( )

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes_____ No_X___

The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and Chief Financial Officer, of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information required to be included in periodic filings with the Securities and Exchange Commission. There were no changes in the Company's internal controls or in other factors that could significantly affect these internal controls subsequent to the date of our most recent evaluation.

## PART III

### Item 9: Directors, Executive Officers, Promoters and Control Persons; Compliance with Section 16(a) of The Exchange Act

### Executive Officers and Directors

MANAGEMENT

**Dallas Talley, Age 72,** (Director since 1998) Chairman and CEO since 2000, has over thirty-five years of high tech senior executive experience. He has been CEO of New York Stock Exchange and NASDAQ companies including Qantel Business Computers, Televideo Systems and Zentec Corp. He has also been founder and director of several emerging companies. Mr. Talley was Managing Partner of an international technology development group specializing in technology transfers in Asia Pacific, Europe and selected developing nations. He served on the Board of Directors of the American Electronics Association (AEA) from 1984 to 1989 and served as Chairman of AEA's Silicon Valley Chapter. Since joining the Board of Directors in 1998, Mr.

16

Talley has been responsible for maintaining and expanding the company's relationship with Lawrence Livermore National Laboratories and for implementing the company's private placements and strategic alliances.

**George Butterworth, age 67,** President (Effective March 1, 2006) Mr. Butterworth holds a BSc Physics, Nottingham University (England). He previously held management positions with Westinghouse Electric for over 25 years, including Managing Director and President of the Westinghouse PGBU organization in the UK, including its involvement in the Westinghouse - Rolls Royce Joint Venture. Mr. Butterworth was Manager, Development Services at Siemens-Westinghouse until his retirement on April 2005. Mr. Butterworth also held management positions in; Brussels, Belgium, Pittsburgh, Pa and Dallas, Texas. He served four years as Vice President, responsible for Radioisotope Production for International Isotopes, Inc. where he lead the installation, commissioning and operation of the world's largest Linear Accelerator to be employed for the

production of radioisotopes for medical applications.

**Phil Marshall, Age 56,** Chief Financial Officer, has over thirty years experience in financial management and audit services. He has been a Principal or Partner for over twenty years with KMG Main Hurdman, KPMG Peat Marwick, Jackson & Rhodes, and Whitley Penn. His public accounting experience includes multinational companies with extensive SEC reporting in a variety of operating companies including environmental, manufacturing and service companies. Mr. Marshall joined the Company in the third quarter of 2003. During the three previous years, Mr. Marshall was a Principal with Whitley Penn and Shareholder/Director of Audit Services with Jackson & Rhodes P.C.

## Board of Directors

The Company's Board of Directors at year-end 2005 consisted of five members. The Company's By-Laws permit the Board of Directors to consist of any number of members greater than two (2) as determined by the then current Board of Directors. The Advisory Board has been appointed by the Board of Directors to assist the Board of Directors with nomination of members of the Board of Directors which will be submitted to shareholders for proxy election at the next annual meeting.

We currently have an audit committee and a compensation committee of the Board of Directors. Mr. Friezen, Mr. Macgregor and Ms. Heywood make up the audit committee and Mr. Friezen and Ms Heywood form the compensation committee. The Board of Directors is in the process of evaluating the need for other appropriate committees for our future growth.

We do not currently have a process for security holders to send communications to the Board of Directors. However, we welcome comments and questions from our shareholders. Shareholders can direct communications to our Chief Executive Officer, Mr. Dallas Talley, at our executive offices, 4251 Kellway Circle, Addison, Texas 75001. While we appreciate all comments from shareholders, we may not be able to individually respond to all communications. We attempt to address shareholder questions and concerns in our press releases and documents filed with the SEC so that all shareholders have access to information about us at the same time. Mr. Talley collects and evaluates all shareholder communications. If the communication is directed to the Board of

17

Directors generally or to a specific director, Mr. Talley will disseminate the communications to the appropriate party at the next scheduled Board of Directors meeting. If the communication requires a more urgent response, Mr. Talley will direct that communication to the appropriate executive officer. All communications addressed to our directors and executive officers will be reviewed by those parties unless the communication is clearly frivolous.

Our Bylaws provide that nominations of persons for election to the Board of Directors of the corporation may be made at a meeting of stockholders by or at the direction of the Board of Directors or by any stockholder of the corporation entitled to vote in the election of directors at the meeting

who complies with the following notice procedures, as set forth in the Bylaws.

## DIRECTORS

In addition to Mr. Talley, the Directors of the Company are as follows:

**Tom Friezen, age 46,** (Director since 1997) Mr. Friezen is chairman of the Audit Committee. Mr. Friezen, a registered CPA, has been the CFO of Dakota Growers Pasta Company, Inc. a $170 million food processing company since 1995. He has been responsible for financial, banking and legal activities of his company. During his tenure, Dakota Growers completed two public stock offerings, one private stock offering and one public debt placement, which raised over $70 million in capital. He was also heavily involved in a $27 million business acquisition. He has been also responsible for SEC Reporting and Compliance, taxation and shareholder relations within his company. Mr. Friezen is the financial expert on the Audit Committee for our company.

**Takeshi Ogata, age 70,** (Director since 2000) Mr. Ogata was a senior executive and now is an emeritus, after retirement in 1994, with Itochu Corporation of Tokyo, Japan. Within Itochu he has served as a Managing Director of Itochu Machinery and Information Group and, further as Senior Managing Director as well as President of Itochu Construction. He was one of the founders and Chairman of Itochu's Innotech Corporation. Mr. Ogata was the leader in Itochu's corporate redirection into high technology businesses with a resulting $30 billion equity valuation. He was founder and Chairman of several Itochu technology companies including CTC, the largest systems integrator in Japan with an equity value of $10 billion and J-SAT, a joint venture of Itochu Sumitomo and NTT communications. Mr. Ogata also serves as a business consultant for many companies and ventures in Japan.

**Ann Cochran Heywood, age 60,** (Director since 2000) Ms. Heywood, serves as Chairman of the Compensation Committee. Ms. Heywood has been Senior Fellow in Centre for Global Security Analysis and Advisor for US Nuclear Non-proliferation Program and Manager of Nuclear Cities Initiatives Program with Russian Federation at Lawrence Livermore National Laboratory for over five years. She has a broad background in early stage funding activities, technology development and commercialization, and longer-term management of technical organizations in the public and private sectors. She started the Russian Medical Technology program. Ms. Heywood is currently engaged in converting a Russian weapons assembly facility to the fabrication of kidney dialysis systems. She served as Deputy Secretary for Technology at the California Environmental Protection Agency (CalEPA) and also served as Vice President of Corporate Development at Thermatrix Corporation. Ms. Heywood has managed activities for technology development programs for Lawrence Livermore, SAIC, TRW and the U.S. Department of Energy.

18

**John Macgregor, age 56,** (Director since 2005) Mr. Macgregor retired from the World Bank in 2004 after 25 years of service. He coordinated Bank programs of lending and technical support for Egypt, Yemen, Jordan, Kenya, Somalia, Djibouti, and Bangladesh, and represented the Bank in senior level dialogue with those governments on economic, fiscal and administrative policies. He cofounded a

private group to identify and support private investment opportunities in Kenya, where he lived for four years. He also led efforts to increase Bank support for water and water management programs. Prior to that, he managed the Young Professionals Program of recruitment and placement, led or participated in numerous project appraisals and supervisions in the Philippines, Korea, Kenya, and Brazil, and conducted long-term econometric analysis for India.

## ADVISORY BOARD

**Robert J. Gary**, Chairman: Mr. Gary spent twelve years in managerial positions with General Electric's Large Power Apparatus Group. He was the Executive Vice President and General Manager of the Generating Company of Texas Utilities, a position he held until retirement. He was then appointed consulting Vice President to assist the President and Chairman of TU Electric. Mr. Gary has also served as an executive advisor on Westinghouse's Advance Design Nuclear Reactor Committee, the Atomic Industrial Forum Three Mile Island Recovery Committee and the Texas Utilities Blue Ribbon Task Force on Three Mile Island. In addition, he was co-founder of the Electrical Power Research Institute (EPRI) and a member of the Board of Directors of the American Mining Congress. Since 1992, Mr. Gary has concentrated only on humanitarian projects involving agriculture, environmental, medical, electrical and water. Mr. Gary continues to focus on water matters, the increasing scarcity and quality, and how to innovatively advance technical solutions for water problems. Mr. Gary has been active in the development of CDT Systems, and has been instrumental in the company's worldwide strategy including implementing other water-based technologies within the CDT Systems group.

**Chester W. Nosal**, Mr. Nosal has been associated with CDT Systems since 1998 and was instrumental with the successful investment negotiations with ABB. He is an active advisor and consultant to the company on international policy and opportunities. He is currently and has been for over five years an affiliate of Pillsbury Winthrop in Washington, D.C. Mr. Nosal's law practice encompasses tax, international and telecommunications matters from domestic to global in scope. He was Senior Partner and head of the International Department with a practice in the Washington office of Winston & Strawn. Mr. Nosal also has been involved in business as an investor and director in many domestic and international corporations. He has served as a legal advisor to numerous countries and governments. His practice has included counseling countries on economic development, conducting legal audits of foreign legal, business and governmental systems and advising on foreign affairs; counseling, implementing, negotiating, structuring, and closing United States and international transactions in the following areas: telecommunications, worldwide merger and acquisitions/dispositions, joint ventures, licensing and franchising.

**Tommy Thompson:** Mr. Thompson has been an executive with Fluor Corporation for the past five years. His duties include designing and executing recovery plans for troubled projects. Mr. Thompson is also responsible for developing strategy and implementation plans for new markets. Previously, as Chief Operating Officer of International Isotopes, Inc. from 1996 to 2000, his

19

responsibilities included construction of an FDA-approved radiopharmaceutical manufacturing facility. He also built and placed in to operation a cyclotron and a linear accelerator while working closely with Los Alamos Laboratory. He also led the design and manufacture of a robotic manufacturing unit for International Isotopes. Mr. Thompson has served as Executive Vice President of Coastal Power Company and resided several years in Hong Kong and Singapore while serving as Vice President of Dow Chemicals, Destec Energy (Asia) Corporation, Halliburton International and Brown and Root International Group. The early part of his career was spent with TXU in Dallas, Texas, including managing TXU's Generation Services Group where he had responsibility for a $100 million operating budget.

**William Lee:** Mr. Lee provides advisory services to the Company on various legal and financial matters. He is licensed as an attorney and CPA in Texas. Since 1999, his practice has specialized in the areas of business acquisitions, startups, and spin-offs. Previously, Mr. Lee served as General Counsel, then Chief Financial Officer, and finally Vice President, of INDSPEC Chemical Corporation, North America's only producer of resorcinol, establishing that company's legal department after the founding of the company, and advising the company through the completion of three change-of-control transactions, two manufacturing plant sales, a public bond offering, and a restructuring of the senior bank facility. Prior to that, Mr. Lee was in private law practice with Golden, Potts, Boeckman & Wilson, a Dallas, Texas law firm, concentrating on tax, securities, regulatory, and corporate matters. Before that, he was with Peat, Marwick, Mitchell & Co., CPAs, doing tax work for numerous consolidated groups and other clients.

**Howard Pierce:** Mr. Pierce was a Senior Executive with ABB Asea Brown Boveri, Ltd. (ABB), a $25 billion global corporation headquartered in Zurich, Switzerland, from 1991 until his retirement in 2001. His most recent position was President and CEO - ABB, Inc., with Group responsibility for the U.S. He was responsible for the divestiture of ABB Power Company and ABB Nuclear, and the integration of Elsag Bailey. He previously served as President - ABB Steam Power Plants and Environmental Systems as well as Group Executive Vice President ABB Americas. Mr. Pierce has also served as President of ABB China, Ltd., and relocated its headquarters from Hong Kong to Beijing. He established fourteen majority-owned joint venture companies in China. Prior to ABB, Mr. Pierce was an executive with Westinghouse Electric Corporation from 1967 to 1990. His executive experience with Westinghouse included eight years as General Manager of the $400 Million Power Generation Operations Division and four years as Manufacturing Director - Westinghouse Power Systems Division. Mr. Pierce is currently a Director of Harsco Corp., Ambient Corp., Drexel University and Drexel Medical School. He was a past Director of the U.S. China Business Council (Executive Committee), Trustee of the Eisenhower Exchange Fellowship and past Director of the Save the Sound Charitable Foundation protecting Long Island Sound.

**Ken Curtin**: Mr. Curtin has twenty-five years experience as a Wall Street investment banker and venture capitalist. He was Manager of Corporate Finance at Ladenburg Thalmann & Co. and Drexel Burnham specializing in the initial financing and public underwriting of technology and telecommunications companies. He was a co-founder of Locate Inc. one of the first competitive local exchange carriers in New York and has served as an Advisor to a variety of small businesses. He also has fifteen years in engineering experience in the Defense and Telecommunications industries including research at the RCA Sarnoff Labs. He also has taught at the Graduate School of Science & Engineering at Stevens Institute of Technology. For over two years until his retirement in 2003, Mr.

The category of "Tax fees" includes consultation related to corporate development activities.

All above audit services, audit-related services and tax services were pre-approved by the Audit Committee, which concluded that the provision of such services by Weaver & Tidwell, L.L.P. and Turner Stone & Company, L.L.P. was compatible with the maintenance of that firm's independence in the conduct of its auditing functions.

### Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, this Amendment 1 to the Annual Report on Form 10-KSB for the fiscal year ended December 31, 2005 has been signed by the following persons in the capacities indicated on the 14th day of April, 2006.

| Signature | Title |
|---|---|
| /s/ John Davies<br>John Davies | Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Phil Marshall<br>Phil Marshall | Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Thomas Friezen<br>Thomas Friezen | Director |
| /s/ Takeshi Ogata<br>Takeshi Ogata | Director |
| /s/ Ann Heywood<br>Ann Heywood | Director |

27

### Report of Independent Registered Public Accounting Firm

Board of Directors and Stockholders
Capacitive Deionization Technology Systems, Inc.
Dallas, Texas

10KSB 1 cdts0310ksb.htm

**U. S. SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-KSB**

**(Mark One)**

[X]     ANNUAL REPORT UNDER SECTION 13 OR 15(D) OF THE
SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR
ENDED DECEMBER 31, 2003

[ ]     TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION
PERIOD FROM _____ TO _____.

**Commission file number 0-28291**

**Capacitive Deionization Technology Systems, Inc.**
Operating under CDT Systems, Inc.
(Name of small business issuer in its charter)

| | |
|---|---|
| <u>Texas</u> | <u>86-0867960</u> |
| (State or other jurisdiction of Incorporation or organization | (I.R.S. Employer Identification |

| | |
|---|---|
| <u>13636 Neutron Rd., Dallas, TX</u> | <u>75244-4410</u> |
| (Address of principal executive office) | (Zip Code) |

Issuer's telephone number <u>(972) 934-1586</u>

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which Registered |
|---|---|

Securities registered pursuant to Section 12(g) of the Act:
$.0001 par value common stock
(Title of class)

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.          Yes  X_   No ___

Check if disclosure of delinquent filers in response to item 405 of Regulation S-B is not contained in this form, and no disclosure will be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-KSB or any amendment to this Form 10-KSB.  [ ]

State issuer's revenues for its most recent fiscal year __$15,000__.

The aggregate market value of voting stock of the Registrant held by non-affiliates, computed by reference to the closing price of such stock on February 29, 2004, was approximately $2,596,417. For purposes of this computation, all executive officers, directors and ten percent (10%) beneficial owners of the Registrant are deemed to be affiliates. Such determination should not be deemed an admission that such executive officers, directors and ten percent (10%) beneficial owners are affiliates.

State the number of shares outstanding of each issuer's classes of common stock, as of the latest practicable date.

(As of February 29, 2004)          17,138,699 shares



file://Z:\CLIENT-W\W&S\MEMOS\Form 10-KSB 2004.htm

| Name | Year | Compensation (3) |
|------|------|------------------|
| Dallas Talley | 2003 | $18,399 |
| Phil Marshall | 2003 | $ 7,860 |
| Dallas Talley | 2002 | $15,473 |

(3)     Included in Accrued Compensation above.

## MANAGEMENT

**Dallas Talley**, Chairman and CEO, has over twenty-five years of high tech senior executive experience. He has been CEO of New York Stock Exchange and NASDAQ companies including Qantel Business Computers, Televideo Systems and Zentec Corp. He has also been founder and director of several emerging companies. Mr. Talley was Managing Partner of an international technology development group specializing in technology transfers in Asia Pacific, Europe and selected developing nations. He served on the Board of Directors of the American Electronics Association (AEA) from 1984 to 1989 and served as Chairman of AEA's Silicon Valley Chapter. Since joining the Board of Directors in 1998, Mr. Talley has been responsible for maintaining and expanding the company's relationship with Lawrence Livermore National Laboratories and for implementing the company's private placements and strategic alliances.

**Chris Sheppard**, Vice President and Chief Technology Officer, has had management experience in several high technology fields including the "Star Wars" SDI program. His experience includes engineering and F&D management positions with Kaman Aerospace, Martin Marietta and Lockheed Missile Systems Group. He was also a founder, principal and chief engineer of Anaphoric Engineering and Photon Sciences International. He has been closely aligned with Lawrence Livermore National Laboratories and was instrumental in securing FarWest Group's CDT license. Since co-founding FarWest Group in 1997, he has been responsible for the development and commercialization of the CDT technology.

**Phil Marshall**, Chief Financial Officer, has over thirty years experience in financial management and audit services. He has been a Principal or Partner for over twenty years with KMG Main Hurdman, KPMG Peat Marwick, Jackson & Rhodes, and Whitley Penn. His public accounting experience includes multinational companies with extensive SEC reporting in a variety of operating companies including environmental, manufacturing and service companies. Mr. Marshall joined the Company in the third quarter of 2003.

**Joe Jones**, Vice President Business Development, has over 22 years experience in business development, business expansion and strategic alliance development with multi-billion dollar organizations. He spent over 16 years with Niagara Mohawk Power Corporation in strategic and business planning, business development and alliance/partnership development. He was President of a multi-million-dollar start-up subsidiary for UPM-Kymmene, a 10 billion-dollar forestry products company headquartered in Helsinki, Finland.

**Don L. Hexamer**, Director of Manufacturing, has over twenty years of engineering management experience. This includes over ten years of semiconductor design and manufacturing management experience. He was responsible for manufacturing, process engineering, equipment design, maintenance and repair for Mostek Inc.'s $300 million operation. He has worked closely with the company's Chief Technology Officer in developing manufacturing processes and continuing the enhancements of the company's carbon aerogel, which is the core technology of Capacitive Deionization.

The future success of the Company depends to a significant extent upon certain senior management, technical personnel, and development personnel. The Company also believes that its future success will depend in large part on its ability to hire and retain highly skilled technical, managerial, and marketing personnel, as well as to attract and retain replacements for or additions to such personnel. Demand for new, specially trained and experienced personnel has increased worldwide. The loss of certain key employees or the Company's inability to attract and retain other qualified employees could have a material adverse effect on the Company's business. In order to reduce this risk to the Company, employment contracts are in effect for Mr. Talley, Mr. Sheppard, Mr. Marshall, Mr. Hexamer and Mr. Jones; each of those agreements has a two year term, modified to be effective on January 1, 2003 and ending on December 31, 2004, except for Mr. Marshall, whose agreement was effective July 1, 2003 with a two-year term. Mr. Sheppard has a two-year technology consulting contract which is also effective through December 31, 2004. Subject to financing, each agreement is automatically extended by an additional year upon each anniversary date of the agreement unless a 90-day written notice is provided to the executive.

**2000 Stock Option Grants**

The Company does not provide cash compensation for the members of the Company's Board of Directors, in their roles as directors. (Directors who are employees receive compensation for their services as employee of the Company.) However, each director is reimbursed for direct expenses incurred due to service on the Board of Directors. Each director who is not an employee is granted an option to acquire 100,000 shares of the Company's Common Stock, for three years service on the Board of Directors. One third of the options granted to each "outside" director are vested on the date of grant and one third on each of the next two anniversaries of the date they joined the Board of Directors. In addition, the company established an Advisory Board in 2000. The Advisory Board provides assistance to management and the Board of Directors as well as establishing a strong network of senior Executives, Government leaders, and Financial associates throughout the world. The Chairman of the Advisory Board receives an option for 100,000 shares and all other members receive an option for 75,000 shares with the same vesting schedule as the Board of Directors.

The Company has reserved 800,000 shares for issuance under the 2000 Stock Option Plan and 1,200,000 shares under the 2001 Stock Option Plan. All the options under the 2001 Plan have been issued and 925,000 options are available under the 2001 Plan as of December 31, 2003.

### Item 11: Security Ownership and Certain Beneficial Owners and Management

#### Directors and Officers of Registrant

The following persons served as directors of the Company for the year ending December 31, 2003:
[Shares issued as of December 31, 2003 totaled 16,581,799.]

| Name and Age | Position | Director Since | Shares Beneficially Owned | % of Stock |
|---|---|---|---|---|
| Dallas Talley (70) | Chairman, CEO, Chief Financial Officer | 1998 | 995,000 (1) | 6.005.82 |
| Thomas Friezen (45) | Chairman Audit Committee | 1997 | 406,800 | 2.45 |
| Takeshi Ogata (65) | Director | 2000 | 185,000 | 1.12 |
| Ann Heywood (58) | Chairman Compensation Committee | 2000 | 100,000 | 0.60 |
| Robert Blaney (49) | Director | 2001 | 100,000 | 0.60 |
| Joe R. Brooks (75) | Non-voting Secretary | 1999 | 41,000 | 0.25 |

#### Advisory Board

Members of the Advisory Board for the year ending 12-31-03 include:

| Name | Position | Member Since | Shares Beneficially Owned | % of Stock |
|---|---|---|---|---|
| Robert Gary | Chairman | 2000 | 350,000 | 2.11 |
| Chester Nosal | Member | 2000 | 530,844 | 3.20 |
| Tommy Thompson | Member | Dec. 2001 | 75,000 | .45 |
| All current executive officers, Board of Directors and Advisory Board members as a group | | | 3,820,644 (2) | 23.04 |

(1) Includes shares held by spouse.
(2) Includes unexercised options.

#### Beneficial Owners:

| Name | Number of Shares | % of Stock |
|---|---|---|
| Clark Vaught | 2,472,500 | 14.91 |
| Total Officers, Directors and Beneficial Owners | 6,262,644 | 37.77 |

No officer or director listed in the foregoing table has any options or warrants to acquire additional shares, which are exercisable during the 60 days after the date hereof.

#### Board of Directors

The Company's Board of Directors at year-end 2003 consisted of (5) members. The Company's By-Laws permit the Board of Directors to consist of any number of members greater than two (2) as determined by the then current Board of Directors. The Advisory Board has been appointed by the Board of Directors to act as the nominating committee for selecting members of the Board of Directors which will be submitted to shareholders for proxy election at the 2003 annual meeting.

**Dallas Talley**, see **MANAGEMENT**

**Tom Friezen**, Mr. Friezen is chairman of the Audit Committee. Mr. Friezen, a registered CPA, is the CFO of a $150 million food processing company. He is responsible for financial, banking and legal activities of his company. He was responsible for two stock offerings and a public debt placement, which raised over $65 million in capital. He was also responsible for a $27 million business acquisition. He is also responsible for SEC Reporting and Compliance, taxation and shareholder relations within his company. He has served on the CDT Systems Board of Director since 1997.

**Takeshi Ogata**: Mr. Ogata is a senior executive with Itochu Corporation of Tokyo, Japan. Within Itochu he has served as a Managing Director of Itochu Machinery and Information Group and Senior Managing Director as well as President of Itochu Construction. He is currently Chairman of Itochu's Innotech Corporation. Mr. Ogata was the leader in Itochu's corporate redirection into high technology businesses with a resulting $30 billion equity valuation. He was founder and Chairman of several Itochu technology companies including CTC, the largest systems integrator in Japan with an equity value of $10 billion and J-SAT, a joint venture of Itochu Sumitomo and NTT communications. Mr. Ogata also serves as a business consultant for the Company in Japan.

**Ann Cochran Heywood**: Ms. Heywood, serves as Chairman of the Compensation Committee. She has a broad background in early stage funding activities, technology development and commercialization, and longer-term management of technical organizations in the public and private sectors. She started the Russian Medical Technology program. Ms. Heywood is currently engaged in converting a Russian weapons assembly facility to the fabrication of kidney dialysis systems. She served as Deputy Secretary for Technology at the California Environmental Protection Agency (CalEPA) and also served as Vice President of Corporate Development at Thermatrix Corporation. Ms. Heywood has managed activities for technology development programs for LLNL, SAIC, TRW and the U.S. Department of Energy.

**Robert T. Blaney**: Mr. Blaney has had diverse experience in project development; project financing, private investment banking and structuring of strategic alliances in both the domestic and international arenas. He founded an international development and financial advisory firm in Washington, D.C., which facilitated major development initiatives through the coordination of private sector parties and bilateral and multilateral agencies. International project activities were undertaken in regions throughout the world including Africa, Asia Pacific and Latin America. He has served on the Board of Directors of the Resource Development Council for Alaska and as the Chairman of the Finance Committee for the U.S. - Africa Chamber of Commerce.

**Joe R. Brooks:** (Non-voting Secretary to the Board of Directors). Mr. Brooks served as Vice President Marketing Administration for Management Systems Division of Pitney Bowes Corporation. Mr. Brooks was CFO of Qantel Business Computer and instrumental in a two hundred million dollar LBO transaction. He served as Controller of Mohawk Data Sciences; and Controller for the General Electric Computer Corporations, Western Region.

## ADVISORY BOARD

**Robert J. Gary**, Chairman: Mr. Gary spent twelve years in managerial positions with General Electric's Large Power Apparatus Group. He was the Executive Vice President and General Manager of the Generating Company of Texas Utilities, a position he held until retirement. He was then appointed consulting Vice President to assist the President and Chairman of TU Electric. Mr. Gary has also served as an executive advisor on Westinghouse's Advance Design Nuclear Reactor Committee, the Atomic Industrial Forum Three Mile Island Recovery Committee and the Texas Utilities Blue Ribbon Task Force on Three Mile Island. In addition, he was co-founder of the Electrical Power Research Institute (EPRI) and a member of the Board of Directors of the American Mining Congress. Since 1992, Mr. Gary has concentrated only on humanitarian projects involving agriculture, environmental, medical, electrical and water. Mr. Gary continues to focus on water matters, the increasing scarcity and quality, and how to innovatively advance technical solutions for water problems. Mr. Gary has been active in the development of CDT Systems, and has been instrumental in the company's worldwide strategy including implementing other water-based technologies within the CDT Systems group.

**Chester W. Nosal**, Mr. Nosal has been associated with CDT Systems since 1998 and was instrumental with the successful investment negotiations with ABB. He is an active advisor and consultant to the company on international policy and opportunities. He is currently an affiliate of Pillsbury Winthrop in Washington, D.C. Mr. Nosal's law practice encompasses tax, international and

telecommunications matters from domestic to global in scope. He was Senior Partner and head of the International Department with a practice in the Washington office of Winston & Strawn. Mr. Nosal also has been involved in business as an investor and director in many domestic and international corporations. He has served as a legal advisor to numerous countries and governments. His practice has included counseling countries on economic development, conducting legal audits of foreign legal, business and governmental systems and advising on foreign affairs; counseling, implementing, negotiating, structuring, and closing United States and international transactions in the following areas: telecommunications, worldwide merger and acquisitions/dispositions, joint ventures, licensing and franchising.

**Tommy L. Thompson**, Mr. Thompson provides consulting and management services to Flour Corporation. His duties include designing and executing recovery plans for troubled projects. He is also responsible for developing strategy and implementation plans for new markets. As Chief Operating Officer of International Isotopes, Inc., his responsibilities included construction of an FDA-approved radiopharmaceutical manufacturing facility. He also built and placed in to operation a cyclotron and a linear accelerator while working closely with Los Alamos Laboratory. Mr. Thompson also led the design and manufacture of a robotic manufacturing unit for International Isotopes. He has served as Executive Vice President of Coastal Power Company and resided several years in Hong Kong and Singapore while serving as Vice President of Dow Chemicals, Destec Energy (Asia) Corporation, Halliburton International and Brown and Root International Group. The early part of his career was spent with TXU in Dallas, Texas, including managing TXU's Generation Services Group where he had responsibility for a $100 million operating budget.

### Item 12:  Certain Relationships and Related Transactions

Pump Company Management approached the Company's Board of Directors to acquire the Pump Company in late 1998. The Company's Board of Directors, in March 1999, approved the sale of the Pump Company to the Pump Company's management whereby Pump Company would assume Pump Company's net liabilities of more than $650,000. Far West agreed to pay Pump Company $70,000 upon financing. In addition, the Company had an account payable of approximately $200,000 to Mr. Clark Vaught, the Company's chairman which Mr. Vaught agreed to assign to the Pump Company. The sale was closed on November 30, 1999. As of December 31, 2001 Company had paid to the Pump Company $238,192. Pump Company management includes Ms. Crews (Mr. Vaught's wife) and Mr. Vaught (after his resignation from Far West Group). The final payment to Pump Company of $31, 808 will be made upon finalization of a Pump Company tax question. The Company also assumed a note payable in the amount of approximately $63,000, of which $45,171 remains outstanding, in connection with the sale of Pump Company.

### Item 13:  Exhibits and Reports on Form 8-K.

1.   Financial Statements
Financial Statements of CDT Systems, Inc.

| | | Page |
|---|---|---|
| (i) | Independent Auditor's Report | 26 |
| (ii) | Balance Sheets as of December 31, 2003 and 2002 | 27 |
| (iii) | Statements of Operations for the years ended December 31, 2003 and 2002 and Cumulative Amounts Through December 31, 2003 | 28 |
| (iv) | Statements of Changes in Stockholder's Equity (Deficit) for the years ended December 31, 2003 and 2002 and Cumulative Amounts Through December 31, 2003 | 29 |
| (v) | Statement of Cash Flows for the years ended December 2003 and 2002 and Cumulative Amounts Through December 31, 2003 | 30 |
| (vi) | Notes to Financial Statements | 31-39 |

2.   Exhibits

(2)    Stock purchase Agreement (Revised) between FarWest Group, Inc. and New Pumpco dated May 24, 1999 for the acquisition of 100% of FarWest Pump Co. effective January 1, 1999 (Filed as Exhibit 2 (a) to Registration Statement on form 10SB dated February 14, 2000 Registrant N. CIK#0001098584 and incorporated herein by reference).

(2)    The Articles of Merger of pro Vantage, Inc. into FarWest Group, Inc. dated July 2, 1996 (Filed

as Exhibit 2.6 to Registration Statement on Form 10SB dated November 22, 1999 Registrant No. CIK#0001098584 and incorporated herein by reference).

(3i)    Articles of Incorporation of Registrant (Filed as to Exhibit Registration Statement on Form 10SB dated November 22, 1999 Registrant No. CIK#0001098584 and incorporated herein by reference).

(3ii)    By-Laws of Registrant (Filed as Exhibit 2.2 to Registration Statement on form 10SB dated November 22, 1999 Registrant No. CIK#0001098584 and incorporated herein by reference).

(2)    Specimen Copy of Common Stock Certificate (Filed as Exhibit 2.3 to Registration Statement on Form 10SB dated November 22, 1999 Registrant No. CIK#0001098584 and incorporated herein by reference).

(10)    Lawrence Livermore License Agreement (Filed as Exhibit 10 to Registration Statement on Form 10SB dated November 22, 1999 Registrant No. CIK#0001098584 and incorporated herein by reference).

(10)    Investment Agreement Between FarWest Group, Inc. and Asea Brown Boveri, Inc. dated December 29, 1999 (Filed as Exhibit (g) to Registration Statement on Form 10SB dated February 14, 2000 Registrant No. CIK#0001098584 and incorporated herein by reference).

(10)    Letter of Intent for the Establishment of a Joint Venture - CDT Systems, Inc./Air Water, Inc. Entered into on January 30, 2004.

| Exhibit No. | Description |
| --- | --- |
| 31.1 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

(b). Reports on 8-K

8K was filed by the registrant on April 17, 2002 relating to the Company's changing of auditors effective with the 2001 audit.

8K was filed by the registrant on August 26, 2003 relating to the Arizona Court of Appeals finding for the Company in a lawsuit against it by certain former employees.

8K was filed by the registrant on December 16, 2003 relating to the Company's establishment of a joint venture in Japan with Air Water, Inc.

8K was filed by the registrant on February 11, 2004 relating to the Company's approval for trading on the Over the Counter Bulletin Board and the completion of a joint venture in Japan.

**Item 14: Principal Accountant Fees and Services**

Aggregate fees billed for each of the last two fiscal years for professional services by the Company's principal accountant for the audit of the annual financial statements and review of the financial statements included in the Company's Forms 10-QSB amounted to $21,000 for the fiscal years 2000, 2001 and 2002 and $19,500 for 2003. The Company's audit committee has pre-approved all audit services.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-KSB for the fiscal year ended December 31, 2003 has been signed by the following persons in the capacities indicated on the 19th day of March, 2004.

| Signature | Title |
| --- | --- |
| /s/ Dallas Talley<br>Dallas Talley | Chairman of the Board and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Phil Marshall<br>Phil Marshall | Chief Financial Officer<br>(Principal Financial Officer) |

| /s/ Thomas Friezen | Director |
| Thomas Friezen | |

| /s/ Takeshi Ogata | Director |
| Takeshi Ogata | |

| /s/ Ann Heywood | Director |
| Ann Heywood | |

| /s/ Robert Blaney | Director |
| Robert Blaney | |


## INDEPENDENT AUDITOR'S REPORT


Board of Directors
Capacitive Deionization Technology Systems, Inc.

We have audited the accompanying balance sheets of Capacitive Deionization Technology Systems, Inc. ("the Company") (a development stage company) as of December 31, 2003 and 2002, and the related statements of operations, stockholders' equity (deficit) and cash flows for the years then ended and for the period from January 1, 2000 (date entered development stage) through December 31, 2003. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Capacitive Deionization Technology Systems, Inc. as of December 31, 2003 and 2002, and the results of its operations and its cash flows for the years then ended and for the period from January 1, 2000 (date entered development stage) through December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company's significant operating losses and its working capital deficit and stockholders' deficit raise substantial doubt about its ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.


/s/ WEAVER & TIDWELL, L.L.P.

Dallas, Texas
February 19, 2004


## CAPACITIVE DEIONIZATION TECHNOLOGY SYSTEMS, INC.
### (A Development Stage Entity)
### BALANCE SHEETS
### December 31, 2003 and 2002

#### Assets

|  | 2003 | 2002 |
| --- | --- | --- |